Good morning. We are delighted to have Judge Richard Tallman with us this week, visiting from the Ninth Circuit. Judge Tallman has come all the way across the country from Coeur d'Alene, Idaho, to help us decide our cases this week, and it's a real pleasure to have Judge Tallman help us with our cases this week. Thank you for your southern hospitality. It's been wonderful. And we have two cases on the docket this morning. The first is O.D. v. Jones Lang. Mr. Sessions is here for the appellant, Mr. Sharman for appellee, and Mr. Sessions, are you ready to proceed? Or Ms. Sharman, sorry. Good morning, Your Honors. My name is Peter Sessions. I represent the plaintiff and the appellant in this action, O.D. This case is about a young woman who suffers from bulimia nervosa, which is a serious mental health condition that forces her to binge and purge food, as well as major depressive disorder. And the record shows that her mental health deteriorated when she transitioned to a new high school. In an attempt to lose weight, she began restricting her food intake, and then she moved on to more serious things like purging as a way to lose weight. Mr. Sessions, had she been diagnosed prior to her admission to the North Carolina hospital? My understanding is that she had not. So she hadn't seen any health care professionals in Atlanta? Not that I'm aware of, no. Okay. And was it the mother then or the parents who decided when they discovered on vacation that she was purging to take her to this specialty hospital in North Carolina? Right, that's exactly what happened. Okay. Which is a common scenario in eating disorder cases, especially with teenagers. They try to hide what they're doing from their and then the condition becomes serious. So as a result, and this is one of the issues that was raised by the district court's opinion and also by UBH in denial, one of the issues raised was, well, why didn't you seek a lower level of treatment first? And the reason is, is because teenagers and eating disorder patients generally tend to try to hide their symptoms, and then they get increasingly worse, and therefore their initial level of treatment needs to be a higher level of So she goes to Veritas Collaborative, which is this facility in North Carolina that specializes in the treatment of eating disorders. And obviously it's this treatment that's the subject of this appeal. And while she was there, she received the intensive treatment that she needed, and over the course of about two months, she did slowly improve. But unfortunately, despite her need for that treatment and the efficacy of the treatment, the claims administrator in this case, UBH, only paid ultimately for about four days of the treatment and refused to pay for the rest. And the district court upheld that decision, and of course, now we're here. So on appeal, we have two contentions, and one has to do with, one is that the district court was too deferential to UBH's denial decision given the procedural errors that were committed by UBH. And the second one is, of course, the central issue in this case, which is whether she needed this treatment in the first place and whether the district court erred in finding that the denial decision was reasonable given the records. Is it the treatment or the level of care that she was afforded? Isn't that the central issue, whether she needed to be, first of all, in a hospital admission? And then I don't understand all the levels, but apparently there's partial hospitalization and outpatient counseling. So isn't that the real issue here? Does the insurance company have to pay for every day of the most expensive level of care under the plan or not? And who makes that determination? That's right. This is a case about level of care. And just to give the court some background, the way mental health treatment works is there are several levels of care. The highest level is inpatient, basically hospitalization. And that's the level of care that you get when basically you are, you're a danger to yourself. You're suicidal or you're hurting yourself or might harm someone else. And then below that is the residential level of care, which is typically where patients are placed when they are no longer needing acute level of care, such as hospitalization, but need to be monitored on around the clock basis to make sure that they don't engage in eating disorder behaviors. And then the step below that is partial hospitalization, which is sort of a treatment. You go in during the day for several days per week, and then the rest of the time you're on your own. And then below that are outpatient levels of care. So the level of care that was received in this case was the residential level of care. And what the district court, what the UBH determined and what the district court agreed with was that partial hospitalization, which is the next level of care, was the most appropriate level of care. Well, we have four different physicians who are all of the opinion that monitoring and partial residential hospitalization is very effective for her treatment. I understand that there are several doctors who said that. I think there are two central problems with those conclusions, though. One is that none of these doctors ever spoke with or talked to my client in this case. Obviously, in cases with psychiatric treatment, firsthand observations by treating physicians are very important. And certainly there's no treating physician rule in ERISA cases. So this court and UBH wasn't obliged to defer to what her treating physicians were saying. But the fact that she was there for two months and that her primary treating doctor wrote a lengthy letter explaining the treatment she received and why it was necessary. Is that Dr. Lacey? Yes, Dr. Lacey. Now, Dr. Lacey is not a medical doctor, right? She's a psychotherapist? Psychologist. A psychologist? Right. Okay. And Dr. Satin, Dr. James, Dr. Goldberg, and Dr. Moss are all of the view that she's doing pretty well under her present treatment monitoring and partial residential hospitalization. Isn't the plan administrator entitled to credit the opinions of medical opinions over those of her psychologists, as long as there's a reasonable basis in the record to support that decision? Well, they're only entitled to rely on them to the extent that those opinions are medical necessity. And in this case, there's no evidence that there was. If you look at the denial letters in this case, and this is part of our argument for why there were procedural errors in this case. If you look at the denial letters in this case, UBH doesn't even mention the plan definition of medical necessity, let alone try to apply it to the facts and circumstances of the case. And that's a violation of ERISA regulations. ERISA regulations specifically require benefit administrators to apply the terms of the plan to the claimant's medical circumstances. Wouldn't that be a procedural error that's considered at the fourth step of the blankenship analysis, the analysis that we set forth in blankenship? I think it's something that the court can consider. And this is an argument that I know the defendant has made that procedural errors should only be considered at the end. But it's our contention that procedural errors are always relevant in making a determination as to whether the administrator acted in good faith. And that's what the abuse of discretion standard of review is. It's a determination about whether the decision was reasonable and was made in good faith. And so if we can successfully demonstrate that the administrator has handled the claim inappropriately, hasn't followed ERISA regulations, that should be compelling evidence that or at least should be evidence that supports the conclusion that the administrator hasn't acted in good faith. And on top of that, on top of not applying the definition of medical necessity that's present in the plan, UBH says that instead what it did was it relied on its guidelines. And we actually submitted a 28J letter to the court about a recent case involving those guidelines in which a district court has found in a class action that those guidelines were not compliant with the law. Well, the letters, I mean, I took a look at the letters and they provide a link to the level of care guidelines, right? I mean, they're not attached to the letters, but there's a link. Why isn't that sufficient? Because what they're required to do is when they deny a benefit claim, they're required to tell the claimant, this is the guideline that we use, this is the criteria that we use to deny your claim. The idea is that the claimant knows exactly why their claim has been denied. If there's a rule or a criterion that's been used, then the administrator is required to tell them what that was. We can't look at these letters and determine why the plan, I mean, we can't look at the letters and determine that there is an indication why that these doctors feel that partial hospitalization is the best level of care for OD. You can, but only in the vaguest, most top level sense. You can glean from these letters that the reason that her claim is being denied is because the doctors don't feel it's medically necessary. But the plan has criteria for determining that and UBH has guidelines for determining that. And it's not clear that any of those criteria were applied in this case. They're not mentioned in the letters and they weren't explained to the claimant. So you want a pin site there instead of just a link to where you can find the guidelines? Yes. If you look at the UBH guidelines, which unfortunately we can't because they're not in the record, they're voluminous. They're very long and they contain many categories and subcategories and criteria. And UBH was obligated to let the plaintiff know so she could properly appeal it what exactly it was that she needed to show in order to get her claim paid. And instead, these denial letters sort of only speak vaguely about you're doing better, you're not harming yourself, and it's not clear that those are criteria that apply to her. So even if the guidelines were in the record, you wouldn't be satisfied with that because you would say you need to direct us to the particular part of the guidelines that support the letter. That's right. Am I correct that the treatment facility had a person that was also assisting the patient with the coordination of the benefit claim? The letters themselves show carbon copies to the attending physician and Veritas collaborative. So I'm assuming there was somebody on the staff at the hospital that was helping the family with the insurance coverage issues? That's right. The appeal in this case was done principally by Veritas, which is typical in these cases because the claim is often not in a good position to do it on their own, especially in mental health cases. In that case, then why isn't it sufficient for the letter to set forth a summary of the basis on which the claim is being denied, send a copy to the hospital that's helping the patient to try and get coverage for the care that's being afforded? Isn't that sufficient notice of the fact that what we really have here is a dispute between different doctors as to the appropriate level of care and whether or not it was medically necessary? Well, I think a letter was sent to Veritas in this case, essentially making that contention. Our argument is that it's not enough just to tell someone your care wasn't medically necessary. That's what our doctors think. I guess what I'm really asking in kind of an obtuse way is can she show prejudice? Can the claimants show prejudice given the fact that they were actively being represented by somebody who is more sophisticated at dealing with administrator plans? Right. Well, the prejudice is that Veritas in preparing its appeal, which is this letter by Dr. Lacey essentially, is she's responding to a contention that the care is not medically necessary but without any guideposts or criteria. So instead what you have is two doctors basically talking over each other about high-level generalities of you seem to be doing okay, you're not hurting yourself, but it's not clear why any of those facts are relevant because we don't know what the criteria are for... I thought the record showed that there were actually direct physician to physician communications between the plan, I'll call them evaluating doctors, and the actual treating physicians who were taking care of her. Right. But those communications, the criteria are conveyed in those communications. I mean, ideally what the administrator should be doing in these cases is saying we have a plan definition of medical necessity. We also have guidelines. Here are the elements of the medical necessity definition. Here are the elements of our guidelines. These are the ones you don't meet and please explain to us why you don't meet these guidelines. But if those communications are ongoing between experts, the doctors, as to what treatment OD really needs in informing the plan administrator as to whether they're medically necessary, I'm having a hard time understanding why this procedural issue actually caused any harm to the claimant. I mean, your argument seems to me to be a very technical one. Well, I don't think it's technical because it goes to the heart of how you make a determination as to whether the benefits are payable. But we ultimately have to determine that the decision by the administrator was an abuse of discretion, do we not? That's correct. And the mere fact that there was a procedural violation doesn't necessarily lead to the conclusion that the administrator abused its discretion, does it? Or do you want a per se rule? No. I mean, the argument that we're not saying that because these procedural errors occurred, therefore, she's entitled to the benefits automatically. What I'm saying is that these procedural errors should cause the court to be concerned about the way the claim was handled. And if you look at the explanations that UBH gave for why the claim was denied, they don't appear to be tethered to any kind of rules or criteria either, which should make the court wonder whether this was actually the correct decision. Well, when Ms. Sharman gets up here, she's going to tell us that all our case law requires is that there be substantial compliance with the ERISA notice requirements. That's correct. Yeah. And my argument is that this is not substantial compliance because substantial compliance would, at a minimum, give the claimant an understanding of what criteria were used to deny her claim. And in this case, she didn't receive that. Okay. All right. Thank you, Mr. Sessions. We'll hear from Ms. Sharman. May it please the court. My name is Joelle Sharman from Louis-Brisbois. We represent Jones-Lang LaSalle Medical Plan. Odie's counsel hangs his hat on reasoning from the Ninth Circuit, cases that are factually inapposite and don't mandate reversal for two reasons. Unlike in the Ninth Circuit, the standard of review in the Eleventh Circuit for the denial of benefit claims precludes consideration of procedural unfairness when there's no structural conflict of interest. And two, while procedural unfairness may bear on claims for this case. But even if the Ninth Circuit cases were the rule in the Eleventh Circuit, wouldn't you still win under Abadie? So, Abadie, Your Honor, in Abadie in the Ninth Circuit, procedural errors and other allegations of unfairness are considered in determining whether the claims decision was reasonable in the first place. But isn't your position that if Abadie applied, there would still be no abuse of discretion, even if you considered those factors? If Abadie applied, which it does not, yes, that the decision was reasonable. But in the Eleventh Circuit, you don't get to the sixth step in blankenship, which is, was there procedural unfairness when there's no structural conflict of interest? The only conflict of interest that is relevant that gets the court to the sixth step is when the claims administrator is the same entity which pays benefits. And in this case, UBH was not the payer of benefits. UBH is not even a party in this action. The issues raised by OD in this appeal are contrary to the court's in blankenship. The truncated review is contrary to the express requirement that this court begin not with determining whether the decision was reasonable or an abuse of discretion, but whether it was de novo correct. If the court agrees with the decision made by the claims administrator, it doesn't reach steps two through six. It stops right there and affirms the of a claims administrator's decision is more like an appeal from an administrative agency. It's based on what is in the record and it's based on what is in the plan. There was some discussion that in the record, the guidelines were not contained. Well, in the plan itself, the plan itself in the definition of medical necessity refers to generally accepted standards of medical practice. Later on in the same document, Jones LaSalle explains to participants that the claims administrator, and in this case, UBH is the claims administrator for mental health claims. The claims administrator develops and maintains clinical policies that describe the generally accepted standards of medical practice. Scientific evidence prevailing medical standards and clinical guidelines supporting its determinations regarding specific services. These clinical policies, as developed by the claims administrator and revised from time to time, are available to covered persons on this website or by calling the number on your ID card and to physicians and other health care professionals on UnitedHealthcare online. So contrary to response to his pin side argument, could you have provided a citation to what part of the guidelines were in play here rather than simply a link to the website and the voluminous materials that are found there? Could they have? Yes. I mean, I assume that your client had specific provisions that they consulted in that underlies the letter. Why can't they tell the claimant what those provisions are? It may be better practice to do that, but that consideration would be relevant, Your Honor, only to the extent that OD had alleged that UBH as a fiduciary breached its duties in not doing that. And this case was only brought under ERISA 502A1B, not under 502A2, not under 502A3. The case called Witt v. UBH, which is not final, that's in a district court in the Ninth Circuit, was brought under both A1B and A3. And what difference does that all make? I have to say I'm not that conversant with ERISA. Sure. ERISA is a very reticulated statute. Some courts have called it everything ridiculous imagined since Adam. But there's a method to the madness. So under 502A1B, that is a claim that a participant or beneficiary can make for either a declaration of his rights under the plan or for benefits. It's basically a benefits provision. And then there are two other provisions in ERISA civil enforcement scheme, 502A. Under 502A2 or under 502A3, the plaintiff can seek equitable relief. Under A2, they seek equitable relief on behalf of the plan. And under A3, they seek equitable relief individually. So when you're talking about benefits under A1B, the Eleventh Circuit in Blankenship, and even going back before that, before Glenn, to White and to Gilmore and to all the cases that preceded Blankenship, a procedural error that is alleged does not heighten the standard of review unless there is a structural conflict. And a structural conflict was not existent in this case. So the district court, for all intents and purposes, skipped the first step of the Blankenship analysis, did not decide whether the provision, whether the claims administrator's decision was correct on a de novo review. It basically skipped to the fourth step. So is that kind of a gut level reaction? I must confess some at how you apply the six-step test. So on de novo review, which is the first step, it's basically the district court takes a look at the administrative record and determines whether the administrator applied the plan provisions correctly. And if it agrees with this decision, it stops and affirms. If it disagrees with the decision, maybe for reasons that OD's counsel argue with regard to the complexities of mental health illnesses. Then it goes to the next step and asks, is there discretion in the plan document? But doesn't that amount to stating the conclusion without demonstrating the steps in the analysis? I don't understand the question. I mean, as I read that, it seems to me like step one basically says, what's the answer? And then you go to steps two through six, which is the actual analysis. Is that right? To some extent, yes. It's a high-level review on step one. And then on steps two and three, the court looks to see if there's discretion in the plan. And if there is, then what it does is, it again, looks at the administrative record that was before UBH at the time the decision was made and asks, was the decision at least reasonable? And that's not a high standard. But from your perspective, if the district court skipped step one, went through two through six, and then concludes that there was no abuse of discretion, how has blankenship been violated? The court reached the right result, but it did not necessarily go through the exercise. It did what good lawyers do. It applied IRAC, right? Issue, rule, analysis, conclusion. But blankenship seems to be counterintuitive to what we all learned in law school and basic legal writing. Well, blankenship is a result of several years of confusion in earlier cases, starting with HCA in 2001 and the heightened arbitrary and capricious standard of review. And it kind of morphed into what is now the blankenship factors. It was actually before blankenship. I think Doyle talked about it before blankenship, but blankenship gets the credit for it. But it's basically the same understanding as in Firestone, the original case in the Supreme Court. If there's no discretion in the plan, then the decision is generally viewed de novo. When there's discretion in the plan, the different circuits have interpreted ERISA differently. The 11th Circuit has interpreted it differently than the 9th Circuit. And that's where we are. We go to step three. Step three, if there is discretion in the plan, then the court looks to see, is the decision reasonable? How can the decision be reasonable if none of the four United Doctors who've made a medical necessity determination have examined OD, had any contact with OD at all? Is that normal or is that unusual? Well, I don't agree that they did not have any contact insofar as Dr. James on OD's urgent appeal contacted Dr. Lacey, I believe, and spoke at length into OD's issues and actually reversed UBH's initial decision to deny benefits for the entire, at that point, three-day visit. So they had communication with Dr. Lacey, but not with OD? Not with OD. But in ERISA, under the Black and Decker Nord case, the Supreme Court held that ERISA administrators do not have to do that. They do not have to, they don't even have to in ERISA. In this case, UBH did. UBH did defer to Dr. Lacey in terms of that OD needed care from March 20th through March 24th. But based on the fact that she was not suicidal, that she was doing well, that she was not purging, they determined based on their own guidelines that she could step down to a lower level of care. Which party's obligation is it to make sure that the administrative record is complete? It is both parties' obligation to the extent that if the administrative record is, the defendant has the burden to produce the administrative record, but if the administrative record may be incomplete, then the plaintiff has the obligation to pursue all action to try to make it complete. And in this case, that didn't happen. Can you explain why that didn't happen? On appeal, and in the summary judgment motion, OD argued that the guidelines were not contained in the administrative record. And even though they were referred to in the administrative record, and a link was provided to those guidelines, but OD did not attempt to move to compel any additional documents from the defendant. Aside from the discovery process, don't the regulations require you to provide copies of all documents relevant to the claim? Yes. And you're contending that providing the link was enough? I'm contending that, I'm sorry. That that satisfied your obligation? I'm contending that the obligation is not relevant in this appeal because it was only a claim for on the sixth step of the blankenship analysis, only if there was a structural conflict. It would have been different had OD alleged a claim for breach of fiduciary duty under 502-A2 or 502-A3, but the Eleventh Circuit has been very clear as to what the steps are and what is relevant on each step. So, let me, tell me if I understand your argument. So, it sounds like you're saying that they didn't even have to provide the hyperlink. They just didn't have to provide the documents, even though the regulations say they do, and then they get away with it unless there's a structural error or structural conflict. No, Your Honor, because they still on the fourth step have to show that the decision was reasonable. And if there were no explanation as to why they reached that decision, a court could find that that decision was not reasonable. Despite four doctors saying otherwise. So, if there was no hyperlink, would there be substantial compliance with ERISA's notice requirements? If there was no hyperlink, well, there may have been substantial compliance insofar as on the plan makes clear that a participant or a doctor can call the number on the ID card to find out what those guidelines are. Also, in the denial letters, the fact that UBH said that partial hospitalization was available, that is a level of care guideline, partial hospitalization. On the link itself, when you go into it and there's a table of contents, you could click on the hyperlink for partial hospitalization, residential level of care. So, they did refer to the level of care guideline. And to say that technically they didn't put in the denial letter the exact guideline and they didn't specify what page of the plan, that's correct. But substantial compliance in the Eleventh Circuit requires that the participant have the, I'm over my time. May I finish my thought? Substantial compliance requires that a participant be afforded a meaningful review. And in this case, the OD managed to convince UBH twice on appeal to reverse earlier decisions. Thank you, Ms. Sharman. Thank you. Mr. Sessions, you reserve some time. Very briefly, I just wanted to make two points. The first is that the regulations require what they require. Regardless of how the decision is ultimately reviewed by courts under the Blankenship Test or any other test, the regulations are very clear about what they require. And the second point I wanted to make was that defendant's argument, as I understand it, is that we're not allowed to present evidence of procedural mistakes because we haven't alleged a conflict of interest and therefore we never get to the final step of the Blankenship Test where such evidence can be introduced. But my understanding of the case law is that we don't have to allege conflict of interest in order to present evidence of procedural violations. The abuse of discretion standard, which is the standard that was used by the district court in this case, is an evaluation of whether the decision was made reasonably and in good faith. And procedural errors by the defendant call into question whether the decision was reasonable and made in good faith. I would like to think that when the courts are reviewing benefit decisions, they're allowed to take into consideration any relevant evidence as to how that decision was made. And that includes procedural mistakes. And they're not foreclosed under the Blankenship Test from doing so. All right. Thank you, Mr. Sessions. Thank you, Mr. Sharman. The next case is Sherita Langston versus